

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-29-2007

# USA v. Ford

Precedential or Non-Precedential: Precedential

Docket No. 05-4998

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"USA v. Ford" (2007). *2007 Decisions.* Paper 1373.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1373

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Case No: 05-4998

UNITED STATES OF AMERICA

v.

KELVIN FORD,

Appellant

_____

On Appeal from the United States District Court
for the District of New Jersey
District Court No.: 04-cr-562
District Judge: The Honorable Jerome B. Simandle

_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
February 15, 2007

Before: SMITH, FISHER, *Circuit Judges*, and
DOWD, *District Judge**

---

*The Honorable David D. Dowd, Jr., Senior District Judge
for the Northern District of Ohio, sitting by designation.

(Filed: March 29, 2007)

Ralph A. Jacobs
Jacobs & Associates LLC
34 Tanner Street
Haddonfield, NJ 08033
*Counsel for Appellant*

Christopher J. Christie
Sabrina G. Comizzoli
George S. Leone
970 Broad Street
Newark, NJ 07102
*Counsel for Appellee*

_____

OPINION OF THE COURT

_____

SMITH, *Circuit Judge*.

A jury convicted Kelvin Ford of participating in the robbery of two New Jersey banks on June 11, 2003 and June 12, 2003. The District Court sentenced him to 460 months of incarceration for these offenses. He now appeals two issues

2

relating to his conviction and sentence.[1] First, Ford asserts that the District Court abused its discretion in permitting the testimony of the Government's shoeprint expert. Second, Ford challenges the application of the Career Offender provision in United States Sentencing Guideline § 4B1.1(a).

I.

According to the evidence established at Ford's trial, on June 11, 2003, Ford, Donald Johnson, and Christopher Howard robbed the Fleet Bank in Mays Landing, New Jersey, stealing $9,802. On June 12, 2003, the trio robbed the Commerce Bank in Somers Point, New Jersey, absconding with $10,330. The Government presented evidence that during the Fleet Bank robbery, Howard cased the bank, and Ford and Johnson committed the robbery and then fled to a getaway car driven by Howard. The robbery of the Commerce Bank was executed in a similar fashion, except that Howard only cased the bank, Johnson alone committed the robbery, and Ford drove the getaway car. There is no dispute that as Johnson fled the Commerce Bank, Ford, who was driving out of a fast food restaurant, stopped to pick him up. Before Ford was able to collect Johnson, however, he hit another vehicle whose driver

---

[1]The District Court had subject matter jurisdiction pursuant to 18 U.S.C. § 3231. This Court has jurisdiction over Ford's challenge to his conviction under 28 U.S.C. § 1291 and his sentence under 18 U.S.C. § 3742.

was able to identify Ford's automobile. Ford's car was later spotted by a police officer in Egg Harbor Township as it pulled into a car dealership parking lot. Ford and Johnson left the vehicle and fled on foot. While they hid, Ford used his cell phone to contact Howard. Ford and Johnson were seen running through a wooded area, and police pursued them, apprehending both. A search of Ford revealed that he had $2,967 in cash. The police recovered $7,376 from Johnson. The currency stolen from the Fleet Bank branch was not recovered.

In addition to the testimony of co-defendants Johnson and Howard that Ford had been involved in the Fleet Bank robbery, the Government presented evidence that three partial shoeprints lifted from the counter in the bank were similar to the type of imprints that would be made by the shoes that Ford was wearing when he was apprehended. The jury convicted Ford of both bank robberies.

At sentencing, the Government sought the application of the Career Offender provision to Ford on the basis of two prior convictions for crimes of violence. One of those crimes was an escape he attempted while incarcerated at Lorton Reformatory in Virginia. The District Court found Ford's escape to be a crime of violence and agreed with the computation of his criminal history category as a VI under the Guidelines.

II.

We review the District Court's decision for abuse of discretion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138-39 (1997); *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 320 (3d Cir. 2003); *United States v. Sokolow*, 91 F.3d 396, 402 (3d Cir. 1996). Ford argues that the District Court abused its discretion in admitting the testimony of Government expert Eric Gilkerson regarding the shoeprint because the testimony failed to meet the standard for admissibility prescribed in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and Federal Rule of Evidence 702.[2] Ford asserts that because Gilkerson could not provide a more conclusive opinion

---

[2]Rule 702 provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702.

regarding the likelihood that the shoeprint on the bank counter was left by the soles of Ford's shoes than mere similarity between the prints and Ford's shoes, the testimony lacked probative value and should have been excluded under Federal Rule of Evidence 401. Ford's contentions find no support in settled principles of evidence law.

Gilkerson was permitted to testify that the characteristics of Ford's shoes put them in the class of shoes that could have made the impression on the counter. Before admitting Gilkerson's testimony, the District Court conducted a *Daubert* hearing. The two fundamental requirements of *Daubert* are (1) reliability and (2) relevance. 509 U.S. at 590-91. The second requirement should be evaluated under the standard expressed in Rule 401. *See, e.g.*, *United States v. Prince-Oyibo*, 320 F.3d 494, 504 (4th Cir. 2003) ("What Rule 702 does require ... is that the district court make initial determinations that the proffered evidence possesses sufficient evidentiary reliability to be admissible as scientific, technical, or other specialized knowledge *and that the proffered evidence is relevant in the sense that it will assist the trier of fact to understand the evidence or to determine a fact in issue*." (emphasis added)); *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) ("In fulfilling this gatekeeping role, the trial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant...."). The District Court exercised its gatekeeping function and determined that the testimony was based on a reliable methodology, and that it

would assist the trier of fact in determining the fact at issue.[3] *Daubert*, 509 U.S. at 592-93; *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149, 152 (1999). The District Court properly found that the expert shoeprint testimony was based on valid specialized knowledge and would aid the jury in making comparisons between the soles of shoes found on or with the defendant and the imprints of soles found on surfaces at the crime scene. *Id.*; *see, e.g.*, *United States v. Rose*, 731 F.2d 1337, 1345-47 (8th Cir. 1984).

In particular, the District Court evaluated the "reliability of the methods and reliability of their application to the case at hand to determine ... whether there is a suitable fit between the proffered opinion and the facts of the case and, second, whether the opinion will be of assistance to the jury." The Court found that there was general acceptance of shoeprint analysis in both the federal courts and the forensic community, the theory has been subject to peer review and publication, the potential error rate is known,[4] and there are standards and techniques

---

[3]The defendant did not challenge Gilkerson's qualifications.

[4]Courts have admitted shoeprint identification evidence for a long time. *See generally* TERRENCE F. KIELY, FORENSIC EVIDENCE: SCIENCE AND THE CRIMINAL LAW 281-314 (2d ed. 2006). However, the rate of error in shoeprint identifications has not been firmly established. In evaluating the expert testimony, the District Court stated that "[t]he potential error rate is known and it appears to be quite low, only dependent upon an error

commonly employed in the analysis.[5] The Court agreed that

---

made by an examiner rather than an error underlying [the] theory." Ford does not attack the admission of the evidence on the basis of a lack of a sufficient error rate for the field as a whole. His objections are to the method employed by the expert and to the lack of confidence expressed by the expert in his own conclusions.

[5]We note the distinction between the forensic identification sciences and the type of science typically at issue in *Daubert* cases. Expert testimony based on empirical science "does things like determining what substance something is (e.g., what is that white powder?) or measuring the quantity of something (e.g., how much alcohol is in the murder victim's blood?)." Michael J. Saks, *Banishing Ipse Dixit: The Impact of* Kumho Tire *on Forensic Identification Science*, 57 WASH. & LEE L. REV. 879, 881 (2000). Forensic identification science has a different objective. Forensic identification evidence serves to "connect a crime scene object or mark to the one and only source of that object or mark." *Id*. The reliability of these sciences rests upon the experience and observational powers of their practitioners. *See, e.g.*, KIELY, *supra* note 4, at 293 ("The value of any such impressions depends on its integrity and the preservation methods used by police and forensic technicians."). While a strict application of the *Daubert* factors to forensic identification sciences might be a fruitless exercise, due to the inherently experiential nature of this type of expertise, the District Court will be in the best position to make this determination. *Kumho* instructs us that "relevant reliability concerns may focus upon

Gilkerson followed the recognized techniques.

The District Court found that Gilkerson's opinion that the class characteristic comparison showed similarity between Ford's shoe and the print was an acceptable opinion for shoeprint experts to express under *Daubert*. The Court found that "although the latent prints were not complete, ... there is clearly sufficient underlying information to reliably express the careful opinion ... regarding the similarity of characteristics and the inability to rule out based upon any difference."

The Court then turned to the assistance that Gilkerson's testimony would provide the jury, and evaluated "whether it provides in a reliable way some probative piece of evidence that would be helpful to a lay jury in understanding the case and

personal knowledge or experience," 526 U.S. at 150, which counsels against any presumption for or against the admission of evidence derived from forensic identification science. We review these determinations under an abuse of discretion standard, and recognize some of the difficulties inherent in this type of science. *See* Craig M. Cooley, *Reforming the Forensic Science Community to Avert the Ultimate Injustice*, 15 STAN. L. & POL'Y REV. 381, 391 (2004); Note, *Reliable Evaluation of Expert Testimony*, 116 HARV. L. REV. 2142, 2154-60 (2003); *see generally* WILLIAM J. BODZIAK, FOOTWEAR IMPRESSION EVIDENCE: DETECTION, RECOVERY, AND EXAMINATION (2d ed. 2000). As we explained above, the District Court did not abuse its discretion.

reaching a reliable conclusion." The Court determined that it did, stating that "[w]hat he brings to this that a lay jury does not is his knowledge of ... shoeprint and forensic comparison in general, [and] second, his ability to make the examination, including [making] the direct print from the shoes themselves for purposes of comparison and, third, his ability to overlay the direct print and the lifted print...."

By engaging in this evaluation, the District Court followed the gatekeeping process contemplated in *Daubert* and *Kumho*. The District Court assessed both the reliability and helpfulness or relevance concerns expressed in *Daubert*. With respect to reliability, the District Court heard Gilkerson's explanation of his methodology and found that it sufficiently conformed to the *Daubert* factors. The Court's relevance determination was also proper. As the Supreme Court explained, "Rule 702 further requires that the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue.' This condition goes primarily to relevance." *Daubert*, 509 U.S. at 591. Gilkerson's testimony, although cautious and tempered, went directly to a key factual question in the case: Whether the print on the counter was made by the shoes worn by Ford on the day he was apprehended. This Court has previously expressed the view that "the standard for this [relevancy] factor 'is not that high.'" *Lauria v. Nat'l R.R. Passenger Corp.*, 145 F.3d 593, 600 (3d Cir. 1998) (quoting *In re Paoli R.R. Yard*

10

*PCB Litigation*, 35 F.3d 717, 745 (3d Cir. 1994)).[6] Gilkerson's

---

[6]The discussion of "fit" in *Paoli* indicated that the standard for analyzing the fit of an expert's analysis to the case at hand is "not that high," but is "higher than bare relevance." *Id.* at 745. That statement remains sound law inasmuch as it requires that experts who purport to apply their principles and methods to the facts of the case do so in a reliable manner. The *Paoli* Court's discussion of fit requires that expert opinions that apply principles or methods to the facts of the case and produce conclusions that have a debatable connection to the question in issue be predicated on a reliable methodology. *Id.* This is the critical import of *Paoli*'s discussion of fit within the context of reliability. Outside of this relatively narrow setting, "fit" is a relevance concern.

Following *Paoli*, this Court reiterated the helpfulness discussion in *Daubert*, and noted the Supreme Court's explanation that "[f]it is not always obvious, and scientific validity for one purpose is not necessarily validity for other unrelated purposes." *In re TMI Litigation*, 193 F.3d 613, 670 (3d Cir. 1999) (quoting *Daubert*, 509 U.S. at 591). We emphasized again that "[t]his requirement [of 'fit'] is one of relevance and expert evidence which does not relate to an issue in the case is not helpful." *Id.*

In its reconsideration of *Daubert* on remand, the Ninth Circuit explained that

> [t]he Supreme Court recognized that the "fit" requirement "goes primarily to relevance," but it obviously did not intend the second prong of Rule 702 to be merely a reiteration of the general

11

testimony that Ford's shoes could not be ruled out as the source of the prints satisfies the basic relevancy standard in Federal Rule of Evidence 401, as it makes a fact of consequence more probable or less probable than it would be without the evidence. *See United States v. Allen*, 390 F.3d 944, 949 (7th Cir. 2004)

> relevancy requirement of Rule 402. In elucidating the "fit" requirement, the Supreme Court noted that scientific expert testimony carries special dangers to the fact-finding process because it "'can be both powerful and quite misleading because of the difficulty in evaluating it.'" Federal judges must therefore exclude proffered scientific evidence under Rules 702 and 403 unless they are convinced that *it speaks clearly and directly to an issue in dispute* in the case, and that *it will not mislead the jury*.

*Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1321 n.17 (9th Cir. 1995) (citations omitted) (emphasis added). Although we do not adopt the apparent presumption of exclusion enunciated by the Ninth Circuit, we agree with the spirit of our sister court's exhortation. In particular, district courts should tread carefully when evaluating proffered expert testimony, paying special attention to the relevance prong of *Daubert*.

The question of fit here is not debatable, as it was in *Paoli*. *See Paoli*, 35 F.3d at 779-81 (evaluating the fit between expert testimony on animal studies and the question of human exposure). Thus, we examine the question of whether Gilkerson's conclusions fit the factual question in issue in the context of our relevance considerations.

12

(finding no abuse of discretion in allowing testimony that a print could have been made by the defendant's shoes, and noting that "an expert need not have an opinion on the ultimate question to be resolved to satisfy the relevance requirement" (quotation marks omitted)). Whether the shoes that Ford was wearing shortly after the June 12 robbery could have made the impressions found on the bank counter after the June 11 robbery was probative of Ford's participation in the robberies, and expert testimony that aids the jury to make such comparisons is admissible. *See United States v. Ferri*, 778 F.2d 985, 988 (3d Cir. 1985) (admitting testimony of an expert who compared impressions inside the shoes found at site of attempted arson with those inside the shoes seized from defendants' residences, and with their inked footprints); *United States v. Ross*, 263 F.3d 844, 846 (8th Cir. 2001); *Rose*, 731 F.2d at 1346-47.

Ford relies on *United States v. Ferreira*, 821 F.2d 1 (1st Cir. 1987), for the proposition that when an expert is unable to render an opinion more precise than that the shoe impressions from the bank counter and those made by the shoes the defendant was wearing were "similar," the opinion should be excluded. We do not find *Ferreira* persuasive. In that case, the shoeprint expert "testified that it was 'possible' but 'not probable' that Ferreira's Nike sneakers left [the] impression," and the District Court excluded his testimony as lacking in probative value. *Ferreira*, 821 F.2d at 5. The First Circuit concluded only that the District Court's decision regarding probative value was not clearly erroneous; it did not hold, as

13

Ford invites us to, that *any* opinion that is even the slightest bit lukewarm fails to meet the requirements for admissibility. An expert opinion that expresses a possibility that a crime scene impression may have been made by shoes worn by the defendant, and otherwise comports with the *Daubert* analysis, is clearly relevant to the question of whether the defendant was present at the scene of the crime.[7]

---

[7]Indeed, due to the inherently closed factual universe created by the Federal Rules of Evidence and the partisan decisions of litigants in selecting experts, it is desirable to have expert witnesses express their degree of confidence accurately. *See* Samuel R. Gross and Jennifer L. Mnookin, *Expert Information and Expert Evidence: A Preliminary Taxonomy*, 34 SETON HALL L. REV. 141, 143-44 (2003) ("[T]he degree of certainty expressed by the witness should reflect both knowledge and its limits, both what is known and what is not."); *id.* at 170-71 ("Normally, a witness's level of confidence is grist for the adversarial mill...."); *id.* at 186. By confining the jury's considerations to the facts and opinions presented to them at trial, the rules circumscribe the amount of available information. Consequently, especially where expert testimony is concerned, the Rules may create an artificially polarized world, leaving the jury to evaluate the often contradictory testimony of dueling experts. Because the parties are apt to select experts based on their ability to provide highly favorable testimony, it is preferable that, where there is cause for doubt as to a particular opinion, the experts make clear any uncertainty.

III.

Ford also contests the District Court's application of the Career Offender provision of the Sentencing Guidelines to him. U.S. SENTENCING GUIDELINES MANUAL § 4B1.1 (2004). He asserts that the District Court erroneously treated his prior conviction for escape as a crime of violence. Ford recognizes that established Third Circuit case law in *United States v. Luster*, 305 F.3d 199 (3d Cir. 2002), weighs against his argument,[8] and argues that *Luster* should no longer be controlling in light of *United States v. Booker*, 543 U.S. 220 (2005). Ford correctly acknowledges that *Booker* does not directly address whether jury fact finding is necessary on the question of whether a particular offense is a crime of violence. Indeed, *Booker* expressly excludes the fact of prior conviction from the purview of jury fact finding. *Id.* at 246 ("Any fact (other than a prior conviction) which is necessary to support a

---

[8]In fact, the case law of almost all of our sister courts of appeals also stands in opposition to Ford's argument. *See, e.g.*, *United States v. Adewani*, 467 F.3d 1340, 1342 (D.C. Cir. 2006) ("[T]he First Circuit joined us in concluding that escape is a crime of violence, bringing the total number of circuits so holding to eleven."); *but see United States v. Piccolo*, 441 F.3d 1084, 1088-89 (9th Cir. 2006) (holding that "a walkaway escape is not a crime of violence," but noting that "an escapee who flees a secured facility or the custody of an armed guard presents a serious risk of injury to himself and others...").

sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt.").

One of the facts that brought Ford within the scope of the Career Offender provision was that he was convicted of the crime of escape. We have already confirmed that every escape is a crime of violence for purposes of § 4B1.1 because of its serious potential to erupt into violence. *Luster*, 305 F.3d at 202.[9] Consequently, no jury fact finding was required.

---

[9]Ford also argues that a categorical approach to whether a crime is properly considered to be a crime of violence is inappropriate. We reject this argument. In support of his contention that individualized fact finding is proper, Ford cites to *United States v. Kenney*, 310 F.3d 135 (3d Cir. 2002), where we looked beyond the mere fact of conviction for possession of contraband by an inmate to determine the nature of the contraband. However, *Kenney* did not involve a conviction for escape, and in *Kenney*, we reaffirmed our commitment in *Luster* to the categorical approach to escape as a crime of violence. *Id.* at 137 ("[C]learly we should review this matter *categorically* as the Sentencing Commission was concerned with the 'nature' of the offense." (emphasis added)). We continue to apply this approach to the classification of escape for purposes of the career offender provision.

## IV.

In conclusion, the District Court did not abuse its discretion by admitting the expert testimony regarding the shoeprint evidence. Nor did the Court err in applying the Career Offender provision of § 4B1.1 to Ford on the basis of his prior conviction for escape. We will affirm the judgment of the District Court.